NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2016-0491


BARBARA F. O'MALLEY & a.

v.

AARON LITTLE & a.

Argued: May 18, 2017
Opinion Issued: August 31, 2017


Casassa Law Office, of Hampton (Daniel R. Hartley on the brief and orally), for the plaintiffs.


Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for Aaron Little and Maryann Little.


LYNN, J. Defendants Aaron and Maryann Little (Littles) appeal an order of the Superior Court (Anderson, J.) quieting title in the plaintiffs, Barbara F. O'Malley and her daughter Helen T. O'Malley, of a strip of land based upon adverse possession, as well as a previous order denying the Littles' motion for summary judgment.[1] We affirm.

_____

[1] Defendant Wells Fargo Bank, N.A. joined in the Littles' motion for summary judgment, and participated in the subsequent bench trial, but it is not participating in this appeal.

The pertinent facts are as follows. Barbara and her husband, Joseph, acquired the property at 7 McKay Avenue in Hampton (McKay Lot) in 1963 for use as a summer home. Over the next 50 years, the couple lived there with their children, including their daughter Helen, during the summer months; they also used the property for week-long vacations in April and intermittent weekend trips. The backyard of the McKay Lot abuts the backyard of the Littles' property at 6 Francis Street (Francis Lot).

In October 1993, Barbara contracted for the installation of a chain link fence between the McKay Lot and the Francis Lot after tenants from the latter began walking across the yard of the Francis Lot with beach chairs and scratching Helen's car. The fence was placed about three to five feet over the property line between the two lots. Between the fence and the property line (disputed area), there is a clothesline as well as an outdoor shower and grill, all of which were used frequently by the O'Malley family. The plaintiffs and their relatives and friends would occasionally park against the fence.

In 1996, following the death of her husband, Barbara deeded the McKay Lot to herself and her daughter Helen. Around this time, Helen planted three rose bushes in the disputed area against the fence, one of which still exists. Tenants of the Francis Lot and other individuals occasionally cut through a gap that existed between the fence and another fence that separated two other abutting properties, but few individuals walked across the disputed area. The individuals who did cross the disputed area did so on only a few occasions.

The Littles purchased the Francis Lot in December 2008. Upon acquiring the property, the Littles assumed that the actual property line was represented by the fence between the two properties. However, in the spring of 2010, Scott McCarthy, a prior owner of the Francis Lot, informed the Littles that the plaintiffs' fence encroached approximately three to five feet onto the Francis Lot from the actual property line. The Littles confirmed this statement by reviewing a survey plan and measuring the property line with a tape measure. They then called the plaintiffs in April 2010 to inform them of this discovery, before stating that they needed to move the fence. The plaintiffs refused. The Littles claimed that, during this conversation, they gave the plaintiffs permission to continue using the disputed area; the plaintiffs denied that such permission was given. Aaron testified that, around this time, he visited the O'Malley property and walked along the fence with Helen, asserting that the correct boundary between the two properties was represented by several pins from an earlier surveyor's plan. However, the location of those pins did not align with the property line depicted on the surveyor's plan.

Nothing more occurred until the fall of 2013, when the Littles once again e-mailed the plaintiffs and requested that the fence be moved. Although the Littles offered the plaintiffs a license to use the disputed area, the plaintiffs

declined.  In November, the Littles contacted the plaintiffs yet again and told them to remove the fence by the end of the year.  The Littles threatened to take action to move the fence if the plaintiffs refused to relocate it.  In December 2013, the plaintiffs instituted this suit to quiet title to the disputed area based upon adverse possession.  The Littles subsequently moved for summary judgment.  The trial court denied the motion.  After conducting a two-day bench trial in June 2016, the court found in favor of the plaintiffs.  Specifically, the trial court found that the plaintiffs did not receive permission to use the disputed area in 2010, and that the Littles' statement to the plaintiffs that the fence needed to be moved "would not put a reasonably prudent person on notice that they had actually been ousted."  This appeal followed.

II

On appeal, the Littles assert that they ousted the plaintiffs in 2010 and/or 2013, before the expiration of the 20-year statute of limitations applicable to adverse possession claims, by asserting their title to the disputed area and demanding that the fence be moved.  The Littles further claim that they implicitly granted the plaintiffs permission by demanding the removal of the fence and then refraining from removing it.  The Littles also contend that the trial court erred in denying their pretrial motion for summary judgment.

Dealing with the last issue first, we decline to entertain the merits of the Littles' claim that the trial court erred in denying their motion for summary judgment because they have failed to brief a fundamental preliminary question bearing on the issue: whether an erroneous trial court order denying summary judgment is reviewable on appeal where, as here, the case proceeds to the entry of a final judgment after trial.  We have never addressed this question and do not do so now.  We note, however, that there is substantial authority for the proposition that in such circumstances the trial record supersedes the summary judgment record, thereby rendering any error in denial of summary judgment unreviewable on appeal.  See Ortiz v. Jordan, 562 U.S. 180, 184 (2011); Brown v. State Farm Fire & Cas. Co., 90 A.3d 1054, 1057 (Conn. App. 2014); Holloman v. McAllister, 345 S.E. 2d 728, 729 (S.C. 1986) ("A majority of states considering the question hold that the denial of a motion for summary judgment is not reviewable on appeal from the trial of a case on its merits.").

In reviewing a trial court's decision rendered after a trial on the merits, "we uphold the trial court's factual findings and rulings unless they lack evidentiary support or are legally erroneous."  Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 476 (2016).  "We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence."  Id.  "Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence."  Id. (quotation omitted).

3

"Nevertheless, we review the trial court's application of the law to the facts <u>de novo</u>." <u>Id</u>.

A

The Littles assert that the trial court erred by ruling that they did not interrupt the plaintiffs' possession of the disputed area. Specifically, they claim that a rightful owner, to oust an adverse possessor, need only assert title and demand that the adverse possessor leave. Consequently, they argue that the trial court erred by requiring them to demonstrate either a clear intent to retake possession of the property or actions sufficient to put a reasonably prudent person on notice that he or she actually has been ousted. The Littles rely primarily upon our decisions in <u>Locke v. Whitney</u>, 63 N.H. 597 (1885), and <u>Towle v. Ayer</u>, 8 N.H. 57 (1835), to support their view.

"To acquire title to real property by adverse possession, the possessor must show twenty years of adverse, continuous, exclusive and uninterrupted use of the land claimed so as to give notice to the owner that an adverse claim is being made." <u>O'Hearne v. McClammer</u>, 163 N.H. 430, 435 (2012) (quotation omitted). The adverse possessor must prove these elements by a balance of probabilities. <u>See</u> <u>Blagbrough Family Realty Trust v. A & T Forest Prods.</u>, 155 N.H. 29, 33 (2007).

A review of our jurisprudence with regard to this question indicates that, contrary to the Littles' claim, ouster requires significantly more than mere verbal demands and assertions of title. In <u>Locke</u>, we held that a dispossessed owner of a lot retained title against an adverse possessor. In the course of reaching our decision we stated that the owner's "entry upon the land" and "claim of title" interrupted adverse possession. <u>Locke</u>, 63 N.H. at 597-98. However, this statement was dicta; the decision in favor of the dispossessed owner was ultimately based upon the fact that the adverse possessor was not entitled to "avail himself of the possession of [prior possessors of the lot] because he [did] not claim under them." <u>Id</u>. Furthermore, we have recognized that entry upon the land does not necessarily interrupt adverse possession. <u>See</u> <u>Alukonis v. Kashulines</u>, 97 N.H. 298, 300 (1952) (holding that a survey of a property did not interrupt the continuity of an adverse possession claim over that property); <u>Gallo v. Traina</u>, 166 N.H. 737, 739 (2014) (holding that a party failed to demonstrate that a trial court committed reversible error, where the trial court asserted that a "mere casual entry by the record owner for a limited purpose is not necessarily sufficient to destroy adverse possession" (quotation omitted)).

Given the conclusions of these decisions, as well as the paucity of facts in <u>Locke</u>, we decline to find its dicta applicable here.[2] <u>See</u> <u>Locke</u>, 63 N.H. at

---

[2] The other case cited by the Littles, <u>Towle</u>, is not directly applicable, insofar as it addressed the requisite degree of control for an adverse possessor to oust a rightful owner from his or her

4

598. On the contrary, ouster of an adverse possessor requires conduct that puts a reasonably prudent person on notice that he or she actually has been ousted. See Gallo, 166 N.H. at 739; see also Crone v. Nuss, 263 P.3d 809, 818 (Kan. Ct. App. 2011) ("A true owner's entry will toll the statute of limitations if his or her acts of dominion are such that they put a reasonably prudent person on notice that the true owner's purpose is to resume possession of the land and that such person actually has been ousted.").

The Littles also rely on our decision in Zivic v. Place, 122 N.H. 808 (1982). However, we find that case distinguishable from this one. In Zivic, the record owner of a road sent a letter to the person claiming an easement by prescription that both asserted title to the road and gave the claimant explicit permission to use the road. See Zivic, 122 N.H. at 812. We found that this letter ended the adversity of the claimant's use because he took no action after receiving the letter to put the rightful owner on notice that his use of the road was still adverse. Id. at 813. Here, the Littles did not grant the plaintiffs explicit permission to use the area, and the plaintiffs ignored the Littles' demands to move the fence, plainly indicating that their use was still adverse. Thus, Zivic does not support the Littles' position.

Here, the Littles repeatedly claimed through telephone calls and e-mails that the fence encroached their property and had to be moved. Yet demands communicated over the telephone or by e-mail are no more effective at ousting an adverse possessor in the present day than demands shouted from a nearby property or delivered by letter would have been at the time of Locke. See Brown v. Whitcomb, 550 A.2d 1, 4 (Vt. 1988) ("Mere verbal protestations without action to reassert control or dominion over the disputed land does not interrupt the adverse possessor's interest in the property. . . ."). Although Aaron Little visited the McKay Lot and conducted a walk along the fence with Helen, he did so merely to reiterate his claim that the fence encroached on his property and had to be moved, and took no further action against the plaintiffs until repeating his demands in 2013. That action alone would not put a reasonably prudent person on notice that he or she has been ousted.[3] See Gallo, 166 N.H. at 739; see also Brown, 550 A.2d at 4 (noting that, where there is "no evidence that [record owner] took steps to eject [adverse possessors] or to disrupt their open possession of the disputed parcel," no interruption of adverse possession exists). Thus, the trial court did not err in ruling against the Littles.

B

The Littles also claim that their assertions of title constituted implied permission to the plaintiffs to continue using the disputed area. In their view, "a demand [to move the fence], followed by forbearance, is permission."

---

property. See Towle, 8 N.H. at 58-63.
[3] The value of the boundary walk as an act of ouster is further diminished by the fact that the boundary asserted by Aaron at that time was incorrect.

5

Assuming without deciding that this argument is preserved for our review, we reject it.

"A use of land is adverse when made under a claim of right where no right exists." Mastroianni v. Wercinski, 158 N.H. 380, 382 (2009) (quotation omitted). "To establish a prima facie case of adverse use, the [plaintiff] must first produce evidence of acts of such a character that they create an inference of non-permissive use." Bonardi v. Kazmirchuk, 146 N.H. 640, 643 (2001). "Once the [plaintiff] satisfies this initial burden, the burden shifts to the [defendant] to produce evidence that the [plaintiff's] use of the [disputed area] was permitted." Id. "The burden of persuasion remains at all times on the [plaintiff]." Id.

The determination of whether the use of a property has been adverse or permissive is a matter of fact to be determined by the trial court. See Ucietowski v. Novak, 102 N.H. 140, 145 (1959). The nature of the use, whether adverse or permissive, may be inferred from the manner, character and frequency of the exercise of the right and the situation of the parties. See id. "We will reverse the trial court's findings and rulings only if they are unsupported by the evidence or are erroneous as a matter of law." Bonardi, 146 N.H. at 643 (quotation omitted).

We agree with the Littles that permission in the context of adverse possession can be either explicit or implied. See Ucietowski, 102 N.H. at 145. However, implied permission must be evidenced by the use of the property and the "situation of the parties," not by the Littles' failure to oust the plaintiffs after making a verbal assertion of title. Id. Here, the trial court evaluated the evidence and concluded that there was insufficient evidence to find that the plaintiffs' control of the disputed area was either explicitly or implicitly permitted. Upon reviewing the record, we find ample evidence that the plaintiffs disputed the Littles' assertion of title over the disputed area and continually defied their demands to move the fence. Consequently, we cannot say that the trial court's ruling was unsupported by the evidence or erroneous as a matter of law.[4]

Affirmed.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.

---

[4] We note the peculiar outcomes that would be produced by the Littles' construction of the concept of implied permission. Under their view, a rightful property owner could undertake two entirely opposing courses of action — granting permission to an adverse possessor or demanding that the adverse possessor vacate the property — and nevertheless realize the same outcome: permission. Furthermore, any property owner could end an adverse possession claim merely by verbally demanding that the adverse possessor leave, because his or her subsequent forbearance would constitute "implied" permission. Such an outcome would contradict our past cases, where we have held that verbal protests are insufficient to end an adverse possession claim. See, e.g., Gallo, 166 N.H. at 739.